STEELE et al. v. HIGHLAND PARK MFG. CO. et al.

HIGHLAND PARK MFG. CO. v. STEELE et al.

(District Court, E. D. South Carolina.   January 15, 1914.)

1. COURTS (§ 367*)—FEDERAL COURTS—AUTHORITY OF STATE DECISION.

A federal court is not bound by the decision of the highest court of a state as to the construction of a particular deed, where the law of the state on the question involved was not settled at the time the deed was executed and the rights of the parties accrued, but under the rule of comity it will lean toward a concurrence with the state decision.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 958, 959; Dec. Dig. § 367.*]

2. DEEDS (§ 128*)—TRUSTS (§ 114*)—CONSTRUCTION—RULE IN SHELLEY'S CASE—EXECUTORY TRUST.

A man conveyed a tract of land in South Carolina to his son, to hold one-half of the same, however, in trust for the use and benefit of a grandson of the grantor during his natural life, and then convey to the appointee by will of the grandson, or, failing such appointment, to his heirs in fee simple.   The son died intestate, and the grandson sold and conveyed the land by deed of general warranty, afterward dying intestate. *Held*, concurring with the Supreme Court of the state, that the trust upon which the deed was made was executory, the trustee being required to convey the land on the death of the life tenant, and the rule in Shelley's Case, although in force in the state, did not apply, and that the deed of the grandson, so far as it related to the one-half held under the trust, conveyed only his life estate.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 413–415, 419–421, 427; Dec. Dig. § 128;* Trusts, Cent. Dig. § 164; Dec. Dig. § 114.*]

3. REMAINDERS (§ 17*)—SUIT BY REMAINDERMEN—LIMITATIONS.

Limitation does not begin to run against a suit by remaindermen to recover property from grantees of the life tenant until the death of the life tenant, although his deed purported to convey the entire estate.

[Ed. Note.—For other cases, see Remainders, Cent. Dig. §§ 12–17; Dec. Dig. § 17.*]

In Equity.   Suit for partition by E. G. Steele and others against the Highland Park Manufacturing Company and others, with cross-bill. On exceptions to master's report.   Sustained in part.

Finley & Marion, of Yorkville, S. C., and McCullough, Martin & Blythe, of Greenville, S. C., for plaintiffs.

Spencer & Spencer, of Rock Hill, S. C., and Tillett & Guthrie, of Charlotte, N. C., for defendants.

SMITH, District Judge.   This is a proceeding for partition originally filed in the court of common pleas for York county on 29th of April, 1910.   The complaint alleged that the complainants were entitled to a one-half undivided interest in four tracts of land in York county, viz.:   Tract A, containing 27 acres, tract B, containing $^4/_5$ of an acre, tract C, containing $^{64}/_{100}$ of an acre, tract D, containing $^{94}/_{100}$ of an acre.   The defendants E. H. Johnson and T. L. Johnson answered, denying that they or either of them had or ever had had any interest in the property sought to be partitioned, and the cause was, on the 16th of May, 1910, removed to this court by the defendant the High-

land Park Manufacturing Company, on the ground of diverse citizenship as involving a controversy wholly between the plaintiff, a citizen of South Carolina, and the defendant, a citizen of North Carolina. The defendant the Highland Park Manufacturing Company answered, denying the title of plaintiff, and pleading sole seisin, and thereafter filed a cross-bill praying the refusal of a partition until the question of title was determined, and especially refusal as to tract A, on the equitable ground therein stated, and that if partition be decreed, then that in any partition the cross-complainant, for the protection of tract A and its improvement, have the benefit of an interest of 5/18 in the tract, divided between Watson and others hereinafter set out, and acquired by cross-complainant, and have a just compensation allowed for the improvements placed by it on all the property sought to be partitioned in case a sale became necessary. The cross-defendant filed an answer to the cross-bill, and by a consent order of this court dated 23d June, 1910, the two suits were directed consolidated and tried together; and by a consent order, made 22d of April, 1911, it was referred to a special master to take the testimony on all the issues raised by the pleadings in the causes and report the same with his conclusions of law and fact. The special master has made his report, and at the October term, 1913, the cause came on to be heard upon the pleadings, the testimony reported, and the reports of the special master and the exceptions thereto. Before his report was made, however, a motion was made before the special master for leave to amend the cross-bill by incorporating certain allegations of fact so as to show that the three small tracts, B, C, and D, above mentioned, under the facts sought to be alleged similar to those alleged originally as to tract A, were not subject to partition. The master refused to allow the bill to be amended, but the motion by agreement between counsel was renewed before the court with like effect as if heard before the master. Exceptions were filed to the master's report, and after the filing of the exceptions, due notice was given that a motion would be made before the court at the time of the hearing for leave to amend the exceptions filed in behalf of the Highland Park Manufacturing Company, in several particulars.

The facts in this case appear to be as follows:

On the 16th November, 1860, John Steele, of the county of York in South Carolina, executed a deed of conveyance, whereby he conveyed to his son Joseph A. Steele a tract of land in York county, in the deed described as containing 494 acres. The deed to Joseph A. Steele is to his heirs and assigns forever of the whole tract in fee simple; but—

"in trust as to the one-half of said piece, parcel or tract of land to stand seised and possessed of the same for the use and benefit of my grandson, the above mentioned John G. Steele for and during the term of his natural life; and at his death to transfer and convey the same to such person or persons as he the said John G. Steele may by his will direct, or in default of such will and direction to the heirs of him the said John G. Steele in fee."

The John G. Steele so mentioned in the deed was the eldest son of the grantee, Joseph A. Steele. Joseph A. Steele, the grantee named in the deed died thereafter intestate, leaving as heirs at law his widow,

Eliza Jane Steele, his son John G. Steele, above mentioned, and his five daughters, Fannie M. Whyte, Jennie E. Smith, Mattie M. Steele, Alice E. McLure and Lizzie I. Steele. After the death of Joseph A. Steele, viz., by deed dated the 3d day of August, 1868, the said John G. Steele conveyed with general warranty to James Pagan, agent of R. Patterson & Co., the whole of the above-mentioned tract of 494 acres. By deeds subsequently executed James Pagan acknowledged that the conveyance to him was as agent of R. Patterson, under the name of R. Patterson & 'Co., for whom he held title.

On the 13th day of April, 1875, R. Patterson executed his deed of conveyance, conveying to Amelia J. Pride 120 acres, being part of the 494 acres conveyed to James Pagan as agent, and on the 23d day of October, 1882, the executors of R. Patterson executed a deed conveying to A. R. Smith and W. B. Wilson, Jr., all of the remainder of the tract of 494 acres stated in the deed to be 400 acres, making the entire land conveyed by Patterson, as acquired by him under the deed to Patterson, 520 acres. On the 1st day of December, 1882, Fannie M. Whyte, Jennie E. Smith, Mattie M. Steele, Alice E. McLure, and Lizzie I. Steele released and quitclaimed to A. R. Smith and W. B. Wilson, Jr., all their interest in the 494 acres. This release does not include any release from Eliza Jane Steele, the widow of Joseph A. Steele. She, by deed dated the 4th of August, 1868, conveyed to James Pagan, as agent of R. Patterson & Co. all her right, title, and interest in the 494 acres. This deed, however, would have only conveyed the life estate, as there are no words of inheritance; but, as there appears to be no question of any claim or right as subsisting in Eliza Jane Steele, it is to be presumed that Pagan is still alive and the life estate of force, or that she had died and her interest had vested in her children, the same as were the heirs at law of her husband, Joseph A. Steele. By deed dated 1st of March, 1877, Amelia J. Pride conveyed to John L. Watson the 120 acres conveyed to her by R. Patterson. On the 13th of October, 1884, John L. Watson executed his deed of that date, in which he declared that, by virtue of the conveyance to him from Amelia J. Pride, he had an undivided interest in the tract of land conveyed to him by her, containing about 97 acres (and not 120 acres), and that Andrew R. Smith and W. B. Wilson, Jr., by virtue of the deed to them of Jennie E. Smith, and others, heirs at law of Joseph A. Steele, had an undivided $5/18$ interest therein, and that they had mutually agreed to make a partition of the said tract of land according to the respective rights, and thereupon conveyed to them 27½ acres, a part of the said tract of 97 acres, being, by estimation, equal in value to $5/18$ of the whole of the tract of 97 acres. By deed dated 31st of December, 1884, W. B. Wilson, Jr., conveyed to A. R. Smith all his undivided right, title, and interest into the same 27½ acres. On the 12th day of May, 1888, A. R. Smith, by deed dated of that day, conveyed to the Standard Cotton Mill of Rock Hill the same 27½ acres.

From this recital it appears that of the 494 acres conveyed by John Steele to his son Joseph A. Steele, one-half was owned absolutely by Joseph A. Steele, and upon his death intestate descended to his heirs at law, viz., his widow and children. There appears to have never

been any division of the land between the grantee, Joseph A. Steele, and his son, John G. Steele, so that at Joseph A. Steele's death intestate there went to his estate one-half, or $9/18$ of the whole, his widow taking $3/18$, and each of his six children $1/18$. Upon the sale of the entire tract by his son John G. Steele in 1868 to James Pagan as agent of R. Patterson & Co., there passed a $1/18$ in the whole which John G. Steele had inherited at the death of his father, Joseph A. Steele, intestate, and also the whole or such part of the other undivided one-half or $9/18$ as John G. Steele took under his grandfather's will. After the sale of the 400 acres to A. R. Smith and W. B. Wilson, Jr., there was released to them the $5/18$ of the other children of Joseph A. Steele in the property. This release to A. R. Smith and W. B. Wilson, Jr., of $5/18$ covered the entire interest of the five daughters of Joseph A. Steele in the whole property, and so had the effect of releasing to A. R. Smith and W. B. Wilson, Jr., $5/18$ of that portion, of the tract of 494 acres, stated in the deeds to be 120 acres, which Patterson had sold to Pride and Pride had sold to Watson. Watson seems to have claimed to own in this 120 acres only the one-half undivided interest which John G. Steele took under his grandfather's will, the $1/18$ which John G. Steele took as one of the distributees of his father, Joseph A. Steele, and the $3/18$ which should have gone to his widow, Eliza Jane Steele. He admitted that Smith and Wilson were entitled to $5/18$ in the 120 acres as conveyed to them by the other distributees of Joseph A. Steele, and upon an agreed partition had conveyed to them $27\frac{1}{2}$ acres as their share of the whole of the 120 acres (alleged to be only 97 acres) of the 494-acre tract as was conveyed by Patterson to Pride, which was by A. R. Smith conveyed to the Standard Cotton Mill of Rock Hill. Some time later, viz., in 1898 the Highland Park Manufacturing Company, by a master's deed from Julius H. Heyward, master, acquired the above-mentioned $27\frac{1}{2}$ acres. No exact date for this deed is given in the testimony. Subsequently thereto the Highland Park Manufacturing Company acquired from M. S. Kimbrell, by deed dated February 8, 1899, $64/100$ of an acre, and from the same party, by deed dated April 4, 1899, four-fifths of an acre, and from the firm of W. L. Roddey & Co., by deed dated February 7, 1899, $94/100$ of an acre, which had been conveyed by Kimbrell to Bigger, and by Bigger to Roddey & Co. These three small tracts of four-fifths of an acre, $64/100$ of an acre, and $94/100$ of an acre, were all parts of the 120 acres (or 97 acres) originally conveyed by Patterson to Pride, being that part of it which was allotted to Watson upon the partition between himself and Smith and Wilson when he conveyed the $27\frac{1}{2}$ acres; Watson having conveyed with general warranty $18\frac{2}{3}$ acres of his part to Kimbrell. John G. Steele, the grandson named in the will of John Steele, died on the 5th of July, 1905, intestate. The plaintiffs in these proceedings are his heirs at law, who after the death of John G. Steele in 1905 instituted in 1910 these proceedings.

The tracts of land in question are all parts of the tract first severed from the 494 acres by the conveyance from Patterson to Pride of 120 acres afterwards found to cover but 97 acres. The 27 acres covers that part of the 97 acres allotted to Smith and Wilson as representing

the ⁵/₁₈ in the 97 acres acquired from the five daughters of Joseph A. Steele, and the three smaller tracts being parcels of the rest of the 97 acres retained by Watson. ·

The first point for determination and one which, if determined in one aspect, may close the whole case, is as to the estate that John G. Steele was possessed of at the date of his deed in 1868 to Patterson, or rather to Pagan as agent of Patterson. The contention for the plaintiffs is that at that date John G. Steele was entitled to but a life estate, and could only pass such by any deed of conveyance made by him. That in addition to his life estate under the will of his grandfather he was vested with a power of appointment as to the remainder, which could be exercised only by will, and, having never been exercised by will, the remainder under his grandfather's deed passed at the death of John G. Steele to his heirs at law, treating the word "heirs" as a word of purchase and not of limitation. In brief their contention is that under the deed of John G. Steele to Pagan in 1868 nothing passed but a life estate, which terminated absolutely upon the death of John G. Steele in 1905. The construction of this identical will has been before the Supreme Court of South Carolina in proceedings by the same plaintiffs against different defendants. The decision is reported in the case of Steele v. Smith, 84 S. C. 468, 66 S. E. 200, 29 L. R. A. (N. S.) 939. In that decision the Supreme Court of South Carolina upholds the contention of the complainants in this action by holding that the rule in Shelley's Case does not apply, by reason of the interposition of a continuing active trusteeship, and that the effect of the language of the deed from John Steele, the grandfather, was to create two estates, viz., an equitable estate for life in John G. Steele, which became transformed into a legal estate for life under the statute of uses, with a general power of appointment by will, and an equitable estate in remainder, depending upon the contingency of the life tenant designating the beneficiary by his will, the estate in remainder remaining executory and equitable, and that in default of an appointment by will by the life tenant, John G. Steele, it followed that upon his death his heirs became vested with the fee in remainder as a legal estate, not by inheritance from the ancestor, John G. Steele, but as purchasers under the grant of John Steele, the grandfather.

[1] If this decision were controlling in this court upon this case between different parties, there would be an end of the question on this point. The defendant, however, claims that the defendant, being entitled to the jurisdiction of this court, is entitled to have the decision of this court upon the question, and that this court is not bound in its construction of the will by the construction placed upon it by the Supreme Court of the state of South Carolina. The rules upon this subject upon the construction of a deed are laid down by the Supreme Court of the United States in the case of Kuhn v. Fairmont Coal Co., 215 U. S. 349, 30 Sup. Ct. 140, 54 L. Ed. 228, as follows:

"1. When administering state laws and determining rights accruing under those laws, the jurisdiction of the federal courts is an independent one, not subordinate to, but co-ordinate and concurrent with the jurisdiction of the state courts.

"2. Where, *before the rights of the parties accrued*, certain rules relating to real estate have been so established by state decisions as to become rules of property and action in the state, those rules are accepted by the federal court as authoritative declarations of the law of the state.

"3. *But where the law of the state has not been thus settled*, it is not only the right, but the duty of the federal court to exercise its own judgment, as it also always does when the case before it depends upon the doctrine of commercial law and general jurisprudence.

"4. So, when contracts and transactions are entered into and rights have accrued under a particular state of the local decisions, *or when there has been no decision by the state court on the particular question involved*, then the federal courts properly claim the right to give effect to their own judgment as to what is the law of the state applicable to the case, even where a different view has been expressed by the state court after the rights of parties accrued. But even in such cases, for the sake of comity and to avoid confusion, the federal court should always lean to an agreement with the state court if the question is balanced with doubt."

In the case of Barber v. Pittsburg, etc., Ry., 166 U. S. 83, 17 Sup. Ct. 488, 41 L. Ed. 925, there had been a decision by the Supreme Court of Pennsylvania construing a will. The will in question had been construed by the Supreme Court of Pennsylvania as vesting an absolute estate in fee simple in the devisee named. A second action of ejectment on the same will was brought in the Circuit Court of the United States, and the questions certified up by the Circuit Court of Appeals to the Supreme Court of the United States were two: First, was the decision of the Supreme Court of Pennsylvania conclusive? and next, What estate did the devisee named take under the devise? The Supreme Court of the United States held that the decision of the Supreme Court of Pennsylvania was not conclusive as constituting an adjudication of the rights of the parties, inasmuch as under the laws of that state a single verdict and judgment in ejectment was no bar to a second action of ejectment. As to whether it was otherwise conclusive, the court held:

"When the construction of certain words in deeds or wills of real estate has become a settled rule of property in a state, that construction is to be followed by the courts of the United States in determining the title to land within the state, whether between the same or between other parties. * * * But a single decision of the highest court of a state upon the construction of the words of a particular devise is not conclusive evidence of the law of the state, in a case in a court of the United States, involving the construction of the same or like words, between other parties, or even between the same parties or their privies, unless presented under such circumstances as to be an adjudication of their rights."

[2] Under these decisions the question in this court to be determined is whether or not the decision made by the Supreme Court of South Carolina in the case reported in 84 S. C. is binding on this court as being the expression of the settled rule of property in the state as of the time of the accrual of the rights of the defendants. Inasmuch as the admitted attempted sale of the whole property (i. e., so much as was owned by John G. Steele) was made on the 3d of August, 1868, the question is: What was (if there was any) the expressed rule of property in South Carolina as shown by the decisions of its highest court of jurisdiction on the 3d of August, 1868, as to the effect of an

212 F.—62

estate created by the words in the deed of John Steele creating the trust in favor of his grandson John G. Steele?

The deed in question conveys the undivided one-half interest to Joseph A. Steele in trust as to the same for the use and benefit of John G. Steele for and during the term of his natural life, and—

"at his death to transfer and convey the same to such person or persons as he the said John G. Steele may by his will direct, or in default of such will and direction to the heirs of him the said John G. Steele in fee."

The deed, therefore, gives to John G. Steele a full life estate, with a power of appointment by will to anybody to whom he saw fit. There were no vested rights, vested in any third parties. By making his appointment by will John G. Steele could enjoy the entire and absolute usufruct and result of the property, and there was no one named in the will who in such case would have any right to complain. The deed is that in default of any direction by John G. Steele by will, the remainder was to go to the heirs of the said John G. Steele. The right of the heirs to succeed to and enjoy the estate was in no way vested or absolute, as given to them directly under the terms of the deed, but would depend in the most favorable view for them upon the uncertain contingency of John G. Steele's failing to exercise his right of appointment.

The position was taken in argument by counsel for plaintiff that the sale by John G. Steele in 1868 was in some way an attempted invasion of the plaintiff's rights by depriving them of a beneficial estate given them directly under the deed of John Steele in 1860. This is wholly erroneous. That deed gave to John G. Steele an entire power of disposition by appointment by will. He could have by his will exercised the power of appointment for the benefit of an entire stranger. There can be no doubt that if John G. Steele had followed up his deed of 1868 by leaving a will of force giving the remainder in the property to Patterson that would have disposed of the question, and disposed of any claim on the part of the complainants in this cause. If John G. Steele in 1868 received full and satisfactory value for the property and undertook to sell an estate absolute for that consideration, he intending to sell and Patterson expecting to receive such an estate, the obligation might be all in the line of requiring him to make a will carrying out his intention. If the power of appointment held by John G. Steele could have been exercised by deed during his lifetime so that he could have enjoyed the proceeds of such an estate absolutely while alive, a court of equity might have compelled the execution of a sufficient appointment by him in aid of his deed, if insufficient, so as to have him carry out the sale accepted by his vendee in good faith. The power of appointment given to him, however, was to be exercised only by will, and the question thus turns upon the extent of the estate actually given him by a proper construction of the deed of 1860, and which he could himself dispose of by deed in his lifetime.

The rule of property known as the rule in Shelley's Case has been, by the highest court in South Carolina having jurisdiction anterior to 1868, declared to be a rule of law governing the devolution of estates

in South Carolina.   In the case of Porter v. Doby, 2 Rich. Eq. (S. C.) 52, decided in 1845, it was decided to be a rule of property of force in South Carolina, and the definition approved by the court in that case is as follows:

"When a person takes an estate of freehold, legally or equitably, under a deed, will, or other writing, and, in the same instrument there is a limitation by way of remainder, either with or without the interposition of another estate, of an interest of the same legal or equitable quality, to his heirs, or heirs of his body, as a class of persons to take in succession, from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate."

This definition would apply to the estate given to John G. Steele under his grandfather's deed, in the present case.   Under that he was vested with a life estate, and there was a limitation by way of remainder over in a certain contingency to his heirs.   The remainder to his heirs was given by way of limitation as consequent upon the determination of the prior life estate, and contingent upon the nonexecution of the power of appointment.   Taking away the power of appointment, it would leave it in the shape of a limitation over to the heirs of John G. Steele.   The devolution and effect of the rule in Shelley's Case is often misunderstood.   It has been sometimes condemned as a mere artificial rule, very often defeating the intention of the testator or grantor.   This criticism is not one that is well founded when the history and the meaning of the rule is considered.

A grant to a man and his heirs might, in common parlance, be now popularly supposed to mean a grant to a man in common with his heirs or his children.   At common law, however, it had a clearly defined meaning.   It meant an estate absolute to the grantee.   His heirs took no interest in it except by inheritance.   He could assign it according to the nature of his estate and grant it himself as he saw fit. The word "heirs" had only the effect practically of showing that the estate was absolute as extending beyond his life, and the property was his, and such is still the rule of law.   Under such a grant a man had a life estate because he had the entire property.   So, in the case of the original application of the rule in Shelley's Case, where a deed was to a man for life, and after his death to his heirs, or any intervening estate of that kind was created, it was held to be in effect the same thing as a grant in fee.   In the grant to a man and his heirs he had a life estate necessarily involved in the larger estate, and so, when he was by surplusage of wording given a life estate and the remainder to his heirs, it went to the same heirs by inheritance that it would have gone to in the first instance had the clause as to a life estate been omitted.   The word "heirs" was therefore construed to be a word of what was termed limitation or inheritance, because the persons who took as heirs would take in that capacity from the holder of the life estate or the previous estate.   Where it was intended to give the property to some one else by express intention and not to heirs, such others were said to take by purchase, and other words than the word "heirs" should be used.   In view of the disinclination of the law to have estates tied up and always to lean to give to a party the property with power of alienation, the rule in Shelley's Case was a most salutary one.   It gave

to the word "heirs" its true common-law definition and application as a word of limitation, and wherever property was given to "heirs," the word was used in the sense of the persons who would take through their capacity as such to the holder of the preceding estate, and the result was as in the case of a grant to a man and his heirs. The rule as carrying out the policy of the law in this respect was looked upon as a most salutary and proper one, tended to give a clear and definite meaning to words of conveyance in deeds of conveyance, and to give clearly defined ascertained estates at law. Under the statute of uses the same effect took place when the conveyance was in the form of one to the use for another. The estate vested under the statute of uses in the cestuis que usent at once in like manner as under the wording it would have vested if the grant had been direct. Under the law appertaining to written trusts, however, and in the subsequent construction of wills which were supposed to be more inartificial and less definitely phrased than deeds, distinctions as to the application of the rule in Shelley's Case arose, and the courts have revolted from what they deem an artificial rule of legal construction for the purpose of giving to a deed a plain and fixed meaning in order to carry out what a court in the case before it thought was the intention of the grantor or the testator. The effect has been in such cases to change the rule from a rule of law to a rule of construction. The rule in Shelley's Case was a perfectly natural, historical development of the common law with regard to the conveyance of an estate in fee. In pursuance of the inclination of courts to avoid conclusions apparently unintended, it was held in the case of written trusts that where a fee under the statute of uses did not vest directly in the party entitled to the beneficial usufruct of the estate, the rule in Shelley's Case would not always apply, and that where the instrument showed an intention that the legal title should continue in the trustee, for the effecting of some purpose by him that would rebut any presumed intention from the language of the common law that the heirs of the grantee would go in by virtue of their position as heirs of such grantee, and evidence an intention on the part of the grantor that they should take directly by reason of some grant emanating directly from the grantor under the terms of the instrument. Under the general rule, however, such exceptions were held to prevent the operation of the rule in Shelley's Case only where there was clearly lodged in the trustee some such duty to perform as would prevent the application of the statute of uses by executing the use at once into the cestui que usent.

In South Carolina the rule was that the word "heirs" is ordinarily, and in its strict sense a word of limitation, and not of purchase, and, used as a word of limitation, would carry the estate to the taker under the rule in Shelley's Case as in the ordinary deed in fee simple to a man and his heirs. Seabrook v. Seabrook, McMull. Eq. (S. C.) 201. The Supreme Court of South Carolina bases its decision upon the construction of this will upon two grounds: (1) That the present case was the case of an executory trust, and the rule in Shelley's Case did not apply; (2) that that rule did not apply unless the estate for life, and that in remainder were of the same quality, both legal or both

equitable, and that in the present case the life estate was legal and the remainder equitable. The Supreme Court of South Carolina further rests its conclusion that the trust was an executory one upon the requirement in the deed of 1860 that the trustee should "convey" the property as might be directed by John G. Steele in his will, or in default of such will then to his heirs holding that "the duty to 'convey' in a case like this will prevent the execution of the trust in the remaindermen under the statute until after the death of the life tenant." Was this the rule in South Carolina in August, 1868? The same case of Porter v. Doby held that "the doctrine seems to be well settled that executory trusts alone are, as a general class, exempted from the operation of the rule," and, "the test of an executory trust is that the trustee has some duty to perform, for the performance of which it is necessary that the title be regarded as abiding in him."

In the case of Wilson v. Cheshire, 1 McCord, Eq. (S. C.) 233 (in 1826), it was held that "where the trustee was required to act, and not merely to hold the estate," the use was not executed, and "where therefore there is a conveyance to trustees in trust to convey or to sell, or to pay the proceeds to a feme covert, * * * the legal estate remains in the trustees, unexecuted by the statute."

In Posey v. Cook, 1 Hill (S. C.) 413 (in 1833) the court held:

"Perhaps the rule might be more accurately expressed to say that, where the intention is that the estate shall not be executed in the cestui que use, and any object is to be effected by its remaining in the trustees, there it shall not be executed."

In Jenney v. Laurens, 1 Speer (S. C.) 356 in 1843) the court holds:

"The general rule, as stated in the elementary books, and to be collected from decided cases, is that the statute executes the use in all cases where there is no act to be done, or discretion to be exercised by the trustee, which he cannot do or exercise, if the estate be another's."

And:

"The trust will be executed unless the object of creating it would be defeated, as in the cases of trusts for married women, and to preserve contingent remainders, or where the trustee has some discretion to be exercised in relation to the estate or the manner of applying the proceeds."

In this case a direction that the trustees were to hold the estate and "apply" the rents, etc., to the parties entitled was held not to be sufficient to defeat the execution of the use, and that the trust was not executory.

In McCaw v. Galbraith, 7 Rich. (S. C.) 74 (in 1853) the direction of the will was that the trustee should hold the lands in trust for the use of the testator's brother, an alien until he should become naturalized, and then to execute to such brother a conveyance of the land, the rents and profits of the land to go to the brother from the day of testator's decease. The court held that the trust was an executory and not executed trust, saying:

"Concerning the execution of uses, as concerning other matters of construction, more indulgence is extended to wills than to deeds, and the cardinal principle of interpretation, applicable to all of these matters in a will, is the intention of the testator. Where he simply gives to one in trust for another.

or to one in trust to permit another to take the profits, or otherwise uses technical terms whose sense is well fixed, his words will, without explanation given by himself in the instrument, be understood in their technical sense; but where, by a plain expression, or a necessary implication arising from the duties which he imposes upon the trustee, he shows that he intends a legal estate to abide in the trustee, his intention will be respected. Thus expressed, the intention is as manifest as if it appeared in the form of a use upon a use (which form is usually adopted in deeds to evade the statutes of uses), and it is no more opposed to law or policy, than is any other contrivance for making that separation of the legal from the equitable estate, which is involved in every trust."

There appear to be no other decisions in the courts of South Carolina prior to 1868 which would affect the question. The inference from these decisions is that in South Carolina it was a matter of intention to be gathered from the instrument. That the use was not executed or executory by any fixed wording, but that, where the intention of the testator would appear to be plainly defeated by holding the trust executed, the court would lay hold of anything in the instrument expressing that intention as controlling that which might ordinarily be the effect of the language used in creating the trust. Thus it might well be argued that the intention of the donor was to prevent a disposition of the property by John G. Steele in his lifetime so as to restrain possible waste and recklessness and allow him the privilege only of disposing of it by will. There is some conflict between the reasoning in Jenney v. Laurens and that in the other cases. The conclusion in Jenney v. Laurens is more in harmony with the conclusion reached as to the general rule by the Supreme Court of the United States in Webster v. Cooper, 14 How. 488, 14 L. Ed. 510, under the principles of which decision the trust in the present cause would be an executed one, and under the rule in Shelley's Case the deed made by John G. Steele in 1868 would have passed the fee to his one-half interest. The question is, not what was the correct general rule, but what was the rule in South Carolina in 1868? and under the decisions in the cases above cited, it would appear at least "in doubt" whether the word "convey" would not be sufficient to prevent the execution of the use by vesting in the trustee some duty to perform in cases where there would be ground for holding that the intention of the grantor would be otherwise defeated.

There appears to be no distinct adjudication in the South Carolina reports prior to 1868 that the use would never be held executed in the case where the two estates were of different quality, one legal and the other, equitable, but the conclusion of the court in the case in 84 S. C. resting upon Porter v. Doby, supra, that such was the rule in 1868 is entirely in accord with the conclusion reached by the Supreme Court of the United States in Vogt v. Graff, 222 U. S. 404, 32 Sup. Ct. 134, 56 L. Ed. 249.

Nor is this result obviated by the fact relied on by the defendants that upon the death of Joseph A. Steele the legal title held by him as trustee descended to John G. Steele as his eldest son and heir at law. John G. Steele then held, under the decision of the South Carolina Supreme Court, the legal estate for life, and if he did then, he became the holder of the legal estate in two capacities, viz., of the life estate

STEELE V. HIGHLAND PARK MFG. CO.

as his own and of the estate in remainder in trust for the remaindermen, his appointees under the will, or his heirs, as an equitable estate, which last legal estate would, on his death, descend to his heirs at law at common law. It has never been held in South Carolina that the vesting of the legal title in a trustee by descent, where he was not the beneficiary or only one of several beneficiaries, would have the effect of defeating the other equitable interests. It is necessary that the party entitled to both the legal and equitable estates must be the same before a merger or coalescence can take place.

Whilst the strict enforcement of the rule in Shelley's Case may be in the long run most salutary, both for reasons of public policy and for the certainty of the quantity of the estate and the giving proper effect in the great majority of cases to the intent of the testator, and whilst this court is itself doubtful of the conclusion reached by the Supreme Court of South Carolina in its construction of this will, and might, if the case were res integra, reach a different conclusion, yet this court finds that it cannot be said that the conclusion reached by the Supreme Court of South Carolina in its construction of this will is clearly at variance with the announcements as to the law made by the courts of highest jurisdiction in South Carolina prior to 1868, and it is therefore the duty of this court, where the question is doubtful, to lean to an agreement with the state court for the sake of comity and to avoid confusion. To do otherwise would, in the language of Mr. Justice Miller in Brine v. Hartford Fire Ins. Co., 96 U. S. 627, 24 L. Ed. 858, be to introduce into the jurisprudence of the state of South Carolina the discordant elements of a substantial right which is protected in one set of courts and denied in the other, with no superior to decide which is right.

It is therefore found as a conclusion of law that the trust in this case was executory, and that under the deed of 1868 John G. Steele conveyed to his grantee so far as the one-half undivided interest was concerned only his life estate.

[3] The defendant has pleaded the statute of limitations in that, John G. Steele having lost possession in 1868 and this suit not having been commenced until 1910, more than 40 years had elapsed since the complainants, or any one through whom they claim, had been in possession, and under such circumstances the complainants are barred under section 109 of the Code of Civil Procedure of 1902. The plea is not well founded. The life tenant, John G. Steele, died in 1905. During his lifetime no action could be instituted by the remaindermen. The possession of the grantees of the life estate was in effect the possession of the life tenant, and the statute did not begin to run against the remaindermen entitled to the fee until the death of the life tenant.

The defendant has taken the further position in its exceptions that, even if the contention of the complainants be sustained as to their right to claim as remaindermen under the deed of 1860, yet that they are not now entitled to any further partition of the lots in the complaint designated as A, B, C, and D for the following reason, viz.: That John L. Watson was the owner in fee of an undivided $4/18$ in-

terest in the 120 (or 99) acres conveyed to Pride and by Pride to Watson. This upon the assumption that in any event, when John G. Steele conveyed to Pagan, he conveyed his $1/9$ of his father's $1/2$ or $1/18$ of the whole tract, and that Watson was also entitled to Mrs. Eliza J. Steele's $3/9$ of her husband's $1/2$ or $3/18$ of the whole, and thus Watson was the owner of $4/18$ of the 120-acre tract. So when Watson and Smith and Wilson had their partition, the part set aside to Watson represented, not only the $9/18$ he claimed for the John G. Steele $1/2$, but also the $4/18$ he thus owned absolutely and that when he sold 18 acres to Kimbrell, the 18 acres so sold did not represent more than the value of the $4/18$ so belonging to him, and standing for that $4/18$ was his own, and neither in the hands of Kimbrell nor of Kimbrell's grantees was subject to partition at the suit of the complainants, the complainants having already had their partition of the rest of the part of the 120-acre tract allotted to Watson, which partition was made in the case of Steele v. Smith, decided by the Supreme Court in 84 S. C.

But there is nothing in the record in this case which shows exactly what was the particular part of the 494 acres involved in the proceedings in Steele v. Smith in the state court. Further, there is nothing to show that Watson owned anything more than an estate for the life of Pagan in the $3/18$ of Mrs. E. J. Steele. The evidence contains an admission of the death of Mrs. Steele, but gives no date. It may be that adverse possession as against her $3/18$ has ripened into the presumption of a deed, but so far as the testimony shows, it may be that James Pagan is still alive, and that all that Watson and his grantees own is an estate for Pagan's life in that $3/18$.

No partition made between Watson and Smith and Wilson could bind the complainants, not being parties or privies. As co-tenants holders of an undivided one-half interest, they hold per my et per tout and are entitled to their full one half of every part of the original 494 acres. Where the other half interest is owned by different persons in separate parcels of the 494 acres, then ordinarily the partition is a separate one in each case as between the owners of the undivided interest in each separate tract. In this case the complainants are as much entitled to a one half interest in the tracts B, C, and D, as in tract A, and the defendant the Highland Park Manufacturing Company being the party before the court claiming the other half interest in all the same tracts, the partition should be made of all the tracts.

The court further finds as a conclusion of fact from the testimony that the cross-complainant has put very valuable improvements and betterments to a very large amount on the premises sought to be partitioned, and that all these improvements and betterments have been made by the cross-complainant on the premises in good faith, and under the belief in the validity of its title. The court further finds as a conclusion of law that, in the partition of the premises as prayed in the bill, the cross-complainant is entitled to a decree allowing it the benefit and advantage of the value of those improvements and betterments, but in such a way as not to deprive the complainants of their

right to one-half of the land or one-half of its value, as the same may be independent of the value of the improvements and betterments so placed upon it.

Under these circumstances the complainants are entitled to a partition of the property, but such partition is to be made so as to preserve to the defendant and cross-complainant the value of its improvements. The testimony in the case is not sufficient for the court to base a conclusion on as to whether the land is incapable of division so as to allot, in the division to the defendant and cross-complainant, that portion of the premises upon which all its improvements and betterments are situated. Nor is the testimony sufficient for the court to come to a conclusion whether or not the property as a whole is incapable of a division in kind and should be sold for the purposes of a partition.

The special master reports that the rental value of the premises sought to be partitioned is alleged to be $200 per annum, and he finds it to be $150 per annum, and recommends that the complainants have judgment for $75 per annum against the defendant from the period of the death of the life tenant, and the findings of the special master on this point are confirmed.

It having been found that the defendant placed its improvements on the property in entire good faith and under a belief as to the validity of its title, and that under the cross-complaint it is entitled to a decree excluding such betterments from the partition, there is no reason why the usual rule in partition should not be followed in this case, and both parties pay their own costs, and where costs are common to both, they should be equally divided and paid. The effect of making the amendment asked for to the cross-bill under the motion made at the hearing would, under the principles decided herein, be to introduce unnecessary matter, and is not at this stage of the cause called for by any requirement of the cross-complainant's position, and the motion is refused.

The motion to permit the amendment of the exceptions to the master's report, made on behalf of the Highland Park Manufacturing Company, is granted.

All exceptions on either side, and all conclusions of the master inconsistent with the findings of this decree, will be overruled, and all exceptions of either party and conclusions of the master in conformity therewith will be sustained.

The defendants E. H. Johnson and T. L. Johnson are not shown to have any interest in the subject-matter of the suit, or to have been in any wise proper parties thereto. The bill is acordingly dismissed as to them, with costs against the complainants.

A formal decree will be drawn embodying and carrying into execution the results of the conclusions of law and fact found in this decree.